[Cite as *State v. Gilliam*, 2016-Ohio-2950.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case Nos. 15CA19 |
| | | 15CA20 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND |
| | | JUDGMENT ENTRY |
| CHARLES R. GILLIAM, II | : | |
| Defendant-Appellant. | : | RELEASED 05/09/2016 |

APPEARANCES:

Jesse A. Atkins, Atkins And Atkins, Attorneys At Law, LLC, Circleville, Ohio, for appellant.

Judy C. Wolford, Pickaway County Prosecuting Attorney, and Heather M.J. Armstrong, Pickaway County Assistant Prosecuting Attorney, Circleville, Ohio, for appellee.

Hoover, J.

{¶1}    Defendant-appellant, Charles R. Gilliam, II ("Gilliam"), appeals the judgments of the Pickaway County Common Pleas Court, finding him guilty of one count of intimidating a witness, a third degree felony; and two counts of theft, one being a fifth degree felony, and one being a first degree misdemeanor. Gilliam was sentenced to 18 months in prison for the intimidation offense and to community control for the theft offenses.

{¶2}    In this consolidated appeal, Gilliam contends that the trial court erred by not declaring a mistrial after it was disclosed at his jury trial that during the course of the State's investigation he had agreed to participate in a polygraph examination. However, because the trial court immediately instructed the jury to disregard any mention of the polygraph test, it did not abuse its discretion in denying Gilliam's motion for a mistrial.

{¶3}    Gilliam also contends that his theft convictions are inconsistent with his acquittal on a burglary charge and must be set aside. Because inconsistency between several counts of a multi-count indictment is not the type of inconsistency that warrants setting aside a jury's verdict, we disagree.

{¶4}    Next, Gilliam contends that his theft convictions and intimidation of a witness conviction are against the manifest weight of the evidence. However, the State presented an abundance of evidence establishing Gilliam's guilt; and even in the face of contradicting evidence, we cannot say that the record indicates that the jury clearly lost its way in reaching its conclusions. Accordingly, we reject this argument.

{¶5}    Finally, Gilliam argues that his trial counsel rendered ineffective assistance of counsel by failing to disclose a key defense exhibit to the State prior to trial thereby causing its exclusion at trial. Because Gilliam has failed to demonstrate how the admittance of the trial exhibit would have resulted in a different outcome, we disagree.

{¶6}    Accordingly, we overrule all four of Gilliam's assignments of error and affirm the trial court's judgments.

## I. Facts and Procedural History

{¶7}    On December 5, 2014, in trial court case number 2014 CR 303, Gilliam was indicted on charges of one count of burglary in violation of R.C. 2911.12(A)(1), a felony of the second degree, and two counts of theft in violation of R.C 2913.02(A)(1), felonies of the fifth degree. On April 10, 2015, he was separately indicted in trial court case number 2015 CR 136, on a single count of intimidating a witness in violation of R.C. 2921.04(B)(2), a felony of the third degree. Gilliam pleaded not guilty to all counts in both indictments; and the trial court consolidated the indictments for the purpose of trial.

{¶8}     The matter proceeded to a two-day jury trial on May 14th and 15th, 2015. Several witnesses testified during the State's case-in-chief, and during Gilliam's case-in-chief. It was adduced at trial that between 4:00 a.m. and 4:30 a.m. on September 9, 2014, someone entered the home of P.D. and G.G. while they slept and took numerous items of personal property including: a laptop computer, a television, a Coach purse, two wallets, two cell phones, credit cards, $70.00 cash, and a Coach checkbook holder. Upon waking up and noticing the missing items, G.G. called law enforcement authorities. As a result, a deputy from the Pickaway County Sheriff's Office was dispatched to the home and arrived around 5:45 a.m. The deputy testified that he observed a set of footprints in the dew-covered yard and a puddle of liquid on the street near the victims' driveway. No signs of forced entry were observed; however, a back door of the home was unlocked. The victims' home is located in Orient, Ohio.

{¶9}     P.D. testified that in the days following the burglary he discovered suspicious activity on his checking account. He called the Pickaway County Sheriff's Office and reported that his debit card had been used at several locations. He was able to provide officers with locations, times, and transaction amounts. Ultimately, it was determined that his card had been used at Meijers, Sterling One Stop (a gas station), The Buckeye Store, Family Dollar, Walmart, and Raising Canes restaurant.

{¶10}   Detective Rex Emrick of the Pickaway County Sheriff's Office also testified at trial. Emrick, the lead detective investigating the burglary, was able to obtain a receipt and video surveillance from Sterling One Stop and Walmart, and a video from Meijers. Emrick testified that after viewing the videos he determined that the individual using the card was Gilliam. The videos from Sterling One Stop and Meijers were played for the jury and admitted as evidence.

{¶11}  According to Emrick, he and Detective Rob Reeser interviewed Gilliam on September 19, 2014. Gilliam was accompanied at the Sheriff's Office by his mother, Lynn Lambert, and his then girlfriend, Miriah Crissinger. A recording of the interview was played at trial. A transcript of the interview also exists in the record. During the interview, Gilliam denied any personal knowledge about the burglary; instead indicating that he had only heard about it from his mother. Gilliam was also shown still shots from the store videos where P.D.'s debit card was used. Gilliam then admitted to using a debit card; however, he claimed that he had received the card from Tyler Stone and was told to use it. At the conclusion of the interview, Gilliam indicated that Stone had "set [him] up" by giving him the card to use.

{¶12}  Detective Emrick also interviewed Crissinger on September 19, 2014. According to Emrick, on that day, Crissinger denied having any knowledge about the burglary or knowing of any possible involvement by Gilliam.

{¶13}  Based on the video surveillance and a tip from Mandie Clayton, Crissinger's mother, Emrick obtained a warrant to search Gilliam's home. The search did not turn up evidence of the burglary; however, Gilliam's cell phone was seized based on information that there were text messages in reference to the burglary on the phone. A subsequent search warrant was then obtained to search the contents of the cell phone. Located within the phone were photographs of the purse and wallet belonging to G.G.

{¶14}  During the course of the investigation, Emrick also interviewed Tyler Stone. When Stone came for his interview he brought a flat screen television and indicated that Gilliam had sold him the television. The television was subsequently identified as the television taken from the victims' home.

{¶15}   Finally, Emrick testified that he was able to confirm that Gilliam had rented a room from the Star City Inn in Grove City, Ohio, on the day the search warrant was executed at his house. A receipt from the Star City Inn, bearing Gilliam's name, was admitted as evidence at trial.

{¶16}   Crissinger also testified at trial. Crissinger and Gilliam had ended their relationship some time after the September 19th interview with Emrick; and Crissinger admitted at trial that she lied during her September 19th interview. According to Crissinger, a short time after the burglary, Gilliam told her that he walked into the home, grabbed as much as he physically could, heard a dog bark, and then left the residence. Crissinger also stated that Gilliam told her that he had taken purses, wallets, cell phones, a laptop, a television, and credit cards. On the day of the incident, Crissinger claimed that she, Kaylie Schooley, and Stone accompanied Gilliam to downtown Columbus so he could sell the cell phones. Crissinger also testified that Gilliam sold some of the other stolen items, that the purses were disposed of at a hotel in Grove City, Ohio, and that she witnessed Gilliam destroying the credit cards.

{¶17}   Schooley also testified during the State's case-in-chief. Schooley indicated that she and Gilliam were friends. According to Schooley, on September 9, 2014, she travelled to Gilliam's home with Stone and Crissinger. While she was outside of the home, she witnessed Stone exit the Gilliam home with a television and also witnessed Stone place the television in the vehicle. Schooley also testified that on that same day, she, Stone, Crissinger, and Gilliam all drove to Columbus so Gilliam could sell two cell phones. Schooley denied knowing how Gilliam had acquired the cell phones.

{¶18}   The State also presented Clayton's testimony at trial. Clayton testified that Gilliam had admitted to her that he was responsible for the burglary and that he was by himself

on the night of the incident. Clayton stated that Gilliam had texted her requesting that she help him dispose of items from the burglary, specifically the purse and laptop. According to Clayton, Gilliam indicated that the items should not be sold to anyone she cared about. Clayton described her relationship with Gilliam as rocky, one in which they would often fight and then make-up.

{¶19}  Clayton also testified that on February 27, 2015, she, her stepfather, Donald Wallen, and her mother stopped at a gas station in Harrisburg, Ohio, to purchase gas. As Clayton exited the gas station store she heard someone yell "bitch". She then turned and saw Gilliam, who continued to yell at her, calling her a "snitch". Clayton testified, specifically, that Gilliam told her she was lucky "he didn't have a female with him right then to kick [her] ass * * * for being a snitch." Clayton admitted at trial that she yelled back at Gilliam and got caught up in the moment, but that she also felt threatened and afraid. She also testified that Gilliam knew she was going to testify against him at trial when the confrontation occurred.

{¶20}  Wallen also testified at trial. He testified that he broke-up the confrontation between Clayton and Gilliam at the gas station. According to Wallen, he heard Gilliam say to Clayton "bring dad out here and I'll kick his ass" and "I'll get some bitch to kick your ass".

{¶21}  In his case-in-chief, Gilliam presented the testimony of several witnesses including Abid Hussain, an employee of the Harrisburg gas station. Hussain testified that he witnessed the confrontation between Gilliam and Clayton. According to Hussain, Clayton instigated the confrontation by screaming at Gilliam and Gilliam said nothing other than "leave me alone". Hussain testified that law enforcement never took a statement from him or otherwise questioned him about the incident.

{¶22}  Gilliam also testified during his case-in-chief and denied any involvement in the burglary and theft. According to Gilliam, Stone was his "pot dealer", and Stone would often

supply him with property to sell on his behalf. In exchange for selling the items of property, Gilliam would be allowed to keep the profits over a set amount; and he received a reduction in the price of marijuana. Gilliam testified that on the day of the incident Stone showed him two cell phones and he agreed to sell the cell phones for Stone. He, Stone, Schooley, and Crissinger then travelled to Columbus to sell the cell phones. He did not believe the cell phones were stolen. After selling the phones, Gilliam testified that he returned to his home briefly, and then later met with Stone at Stone's residence. It was at Stone's residence that Gilliam claimed to have first seen the rest of the stolen property. According to Gilliam, it was at that time that Stone solicited him to sell the rest of the property. Gilliam agreed to sell the property, took pictures of the property with his cell phone, and listed the items for sale on Craig's List.

{¶23} Gilliam also testified that Stone gave him the debit card to use. Gilliam admitted to using the card at Sterling One Stop, Meijers, Raising Canes restaurant, and Walmart. He claimed that he used the card to purchase items for Stone, and in exchange, Stone allowed him to keep a few of the items. He was also present when Stone used the card at Family Dollar but he denied having used the card at The Buckeye Store. Gilliam claimed that he did not know the card was stolen when he used it; and he thought the card belonged to Stone's parents even though the last name on the card differed from Stone's last name. Gilliam also testified about renting a room at the Star City Inn. According to Gilliam, he rented the room because he felt "caught off guard", and unsafe in his own home after the Sheriff's Office arrived with the search warrant. He denied bringing any of the stolen items to the hotel.

{¶24} Gilliam also testified at trial that he never confessed to Clayton that he was responsible for the burglary. He also denied threatening Clayton at the gas station. Instead, Gilliam testified that he tried to ignore Clayton at the gas station but she confronted him and

called him an "F—er". He did admit to saying some things back, but denied he ever threatened her. He specifically denied saying he was going to kick her ass or that he was going to find a bitch to whip her ass. He also denied calling her a snitch or saying he was going to whip her dad's ass.

{¶25}   Finally, Gilliam testified that he was involved in a serious car accident on January 9, 2014, wherein he shattered his hip and pelvis, and was in a coma for 18 days. As a result of the accident Gilliam walks with the aid of a brace. Gilliam testified that in September 2014, he was still getting familiar with the brace, was in extreme pain, had trouble lifting objects, and could not walk long distances.

{¶26}   Gilliam's mother Lynn Lambert and stepfather Corky Lambert also testified during the defense's case-in-chief. Corky testified that the family owns two vehicles, and that both vehicles were present at their home when he awoke at approximately 5:00 a.m. on September 9, 2014. Lynn testified that Gilliam was present and drove her to work on the morning of the burglary. Both claimed that Gilliam did not have access to any other vehicles.

{¶27}   At the conclusion of trial, the jury found Gilliam not guilty of burglary, but guilty of two counts of theft, one a felony of the fifth degree, the other a misdemeanor of the first degree. The jury also found Gilliam guilty of one count of intimidating a witness, a felony of the third degree. The trial court sentenced Gilliam to 18 months in prison on the intimidating a witness count, and to community control on the two counts of theft. The trial court further ordered that the prison term be served consecutively with the community control sentence.

{¶28}   Shortly thereafter, the trial court journalized sentencing entries in each case. Gilliam filed timely notices of appeal from both trial court cases. We consolidated the appeals.

## II. Assignments of Error

{¶29}  Gilliam assigns the following errors for our review:

First Assignment of Error:

> The Appellant's convictions for Theft and Intimidation of a Witness were against the manifest weight of the evidence.

Second Assignment of Error:

> Appellant's convictions for Theft are the result of the erroneous presentation of offenses of similar import, as well as the failure to provide the jury the opportunity to convict for receiving stolen property, both of which resulted in an inconsistent and erroneous verdict and should be accordingly overturned.

Third Assignment of Error:

> Appellant's representation during the trial phase of this matter was ineffective and appellant's conviction should be reversed.

Fourth Assignment of Error:

> The disclosure of a request for polygraph examination was prejudicial error requiring a mistrial.

### III. Law and Analysis

{¶30}  For ease of analysis, we elect to address Gilliam's assignments of error out of order.

### A. Mention of Polygraph Examination

{¶31}  In his fourth assignment of error, Gilliam contends that the trial court erred in overruling his request for a mistrial. Specifically, Gilliam argues that a disclosure during the State's case-in-chief that investigators requested that Gilliam submit to a polygraph examination was prejudicial error requiring a mistrial.

{¶32} When the recording of Gilliam's interview with law enforcement officers was played for the jury, it was disclosed that the officers requested that Gilliam submit to a polygraph examination; and Gilliam indicated he would be willing to do so. Upon the disclosure of this information, the trial court immediately excused the jury from the courtroom for a brief recess. Defense counsel then moved for a mistrial and argued that the mention of a request for polygraph examination constituted prejudicial error that could not be cured by a jury instruction. The State, on the other hand, argued that a curative instruction would be sufficient to cure the error. The trial court expressed dissatisfaction with the State's decision to play an un-redacted version of the recording to the jury, but ultimately decided that a curative instruction would be an appropriate resolution. Thus, the trial court overruled the motion for a mistrial and instructed the jury that it was "to completely disregard and not give any consideration to the fact the defendant was asked to take a polygraph." The trial court also instructed the jury that the polygraph "has nothing to do with this case, and you will disregard that and act as though you never heard that."

{¶33} Whether or not to grant a mistrial is within the sound discretion of the trial court, and its decision will not be reversed absent an abuse of that discretion. *State v. Koon*, 4th Dist. Hocking No. 15CA17, 2016-Ohio-416, ¶ 26. An abuse of discretion occurs when the trial court makes a decision that is unreasonable, arbitrary, or unconscionable. *Id*. "In general a mistrial should not be granted based on an error or irregularity unless an accused's substantial rights are adversely affected." *Id*. at ¶ 27.

{¶34} Generally, "polygraph test results are admissible into evidence only when the defense and prosecution agree to its admissibility." *State v. Landrum*, 4th Dist. Highland No. 14CA12, 2014-Ohio-5714, ¶ 9, citing *State v. Dutiel,* 5th Dist. Perry No.2012–CA–11, 2012–Ohio–5349, ¶ 20, and *State v. Wine,* 3d Dist. Auglaize No. 2–12–01, 2013–Ohio–2837, ¶ 23.

"Ohio law also precludes the admission of the willingness or unwillingness of a party to take a polygraph examination." *State v. Graves*, 1st Dist. Hamilton No. C-950022, 1995 WL 540115, *3 (Sept. 13, 1995). "However, the mere mention of the phrase 'polygraph examination' by a witness testifying on behalf of the state does not necessarily result in prejudice to the accused." *Id*. And the Supreme Court of Ohio, in a case where a detective made a spontaneous comment that the defendant had taken a lie detector test and failed it, found there was no abuse of discretion in not declaring a mistrial because the trial court promptly instructed the jury to disregard the comment and erase it from their minds. *State v. Holt*, 17 Ohio St.2d 81, 83-84, 246 N.E.2d 365  (1969). The Court noted that: "In view of the court's immediate action in this respect, we do not feel justified in holding that the judge's refusal to order a mistrial was prejudicial error." *Id*. at 84. Thus, "[i]mplicit in the holding in *Holt,* is that the court must clearly instruct the jury to disregard the inadmissible comment." *State v. Storms*, 4th Dist. Meigs No. 492, 1993 WL 49445, *2 (Feb. 19, 1993). Finally, jurors are presumed to follow curative instructions. *State v. Mockbee*, 2013-Ohio-5504, 5 N.E.3d 50, ¶ 39 (4th Dist.).

{¶35} In the case sub judice, the trial court promptly and clearly gave a curative instruction to the jury to disregard any mention of the request for polygraph examination. We also note that the reference at issue did not state the result of any polygraph examination that Gilliam might have taken. Accordingly, the trial court's decision to overrule the motion for a mistrial and to rely on the curative instruction was not an abuse of discretion. Gilliam's fourth assignment of error is not well taken and is overruled.

### B. Inconsistent Verdicts

{¶36} In his second assignment of error, Gilliam contends that the jury's verdicts regarding the burglary and theft charges are inconsistent. Specifically, he asserts that the jury's

theft convictions contradict its burglary acquittal and argues that the jury was forced to render inconsistent and erroneous verdicts because the State presented offenses of similar import to the jury, and because the jury was not afforded the opportunity to convict on the lesser offense of receiving stolen property.

{¶37} First, we note that " '[i]nconsistent verdicts on different counts of a multi-count indictment do not justify overturning a verdict * * *.' " *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 138, quoting *State v. Hicks*, 43 Ohio St.3d 72, 78, 538 N.E.2d 1030 (1989). " 'The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count.' " *Id.,* quoting *State v. Adams*, 53 Ohio St.2d 223, 374 N.E.2d 137 (1978), paragraph two of the syllabus. "Thus, a verdict will not be set aside merely because the findings necessary to support the conviction are inconsistent with the findings necessary to acquit the defendant of another charge." *State v. Reine*, 4th Dist. Scioto No. 06CA3102, 2007-Ohio-7221, ¶ 68, citing *Browning v. State*, 120 Ohio St. 62, 71, 165 N.E. 566 (1929). "[T]he sanctity of the jury verdict should be preserved and could not be upset by speculation or inquiry into such matters to resolve the inconsistency." *State v. Lovejoy*, 79 Ohio St.3d 440, 444, 683 N.E.2d 1112 (1997).

{¶38} The cases are clear that consistency between two verdicts in a multi-count indictment is not necessary. Thus, even if such an inconsistency exists in the case sub judice, such inconsistency does not mandate a reversal of Gilliam's conviction.

{¶39} Furthermore, Gilliam's contention that the jury was forced to render inconsistent verdicts by his being indicted and tried for allied offenses of similar import is also misplaced. Even if we were to assume that the theft and burglary counts in this case were allied offenses of

similar import, we note "[a] defendant may be indicted and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 17. In other words, "a defendant may be found guilty of allied offenses but not sentenced on them." *Id*. "R.C. 2941.25(A)'s mandate that a defendant may be 'convicted' of only one allied offense is a protection against multiple sentences rather than multiple convictions." *Id*. at ¶ 18. "Nothing in the plain language of the statute or in its legislative history suggests that the General Assembly intended to interfere with a determination by a jury or judge that a defendant is guilty of allied offenses. * * * [B]y enacting R.C. 2941.25(A), the General Assembly condemned multiple sentences for allied offenses, not the determinations that the defendant was guilty of allied offenses." *Id*. at ¶ 26. Thus, "[b]ecause R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing." *Id*. at ¶ 27 and paragraph three of the syllabus.

{¶40}   As the Supreme Court of Ohio makes abundantly clear in *Whitfield*, the State may indict and try a defendant for allied offenses of similar import. Thus, Gilliam's contention that the jury should not have been given the opportunity to deliberate on both the burglary and theft counts because they are allied offenses of similar import is misplaced. Moreover, we fail to comprehend how the State's decision to try Gilliam on both offenses forced the jury to render inconsistent verdicts.

{¶41}   Finally, we disagree with Gilliam's contention that the jury should have been given the opportunity to convict him of receiving stolen property, rather than theft, and that the failure to provide such opportunity forced the jury to render inconsistent verdicts. First, the State

" 'has great discretion in deciding which charges should be filed and may decide, for a myriad of reasons, not to prosecute on certain charges notwithstanding that sufficient evidence exists to support a conviction.' " *State v. Conklin*, 12th Dist. Butler No. CA94-03-064, 1995 WL 128388, *3 (Mar. 27, 1995), quoting *State ex rel. Tipton v. Schisler*, 4th Dist. Scioto No. 90CA1926, 1991 WL 192733, *3 (Sept. 24, 1991). Moreover, "[t]he mere fact that appellant's conduct violates more than one statute does not force the state to prosecute him under the lesser statute." *State v. Cooper*, 66 Ohio App.3d 551, 553, 585 N.E.2d 868 (4th Dist.1990); *see also State v. Spearman*, 6th Dist. Lucas No. L-01-1373, 2004-Ohio-1641, ¶ 37, and *State v. Jackson*, 10th Dist. Franklin No. 96APA04-504, 1996 WL 684135, *4 (Nov. 26, 1996). More importantly, even if we were to assume, as Gilliam argues, that the failure to present the offense of receiving stolen property to the jury led to inconsistent verdicts, such a result does not constitute reversible error. As discussed above, inconsistency between verdicts does not mandate a reversal of Gilliam's conviction.

{¶42}   For all of the foregoing reasons, we overrule Gilliam's second assignment of error.

### C. Manifest Weight of the Evidence

{¶43}  In his first assignment of error, Gilliam contends that his convictions for theft and intimidation of a witness are against the manifest weight of the evidence. Gilliam argues that the evidence adduced at trial does not support the theft convictions because it does not demonstrate that he knowingly obtained or exerted control over the victims' property without their consent, or that he purposefully acted to deprive the victims of their property. This argument is consistent with Gilliam's theory that he should have been charged with receiving stolen property rather than theft. In regards to his conviction for intimidation of a witness, Gilliam argues that the greater

weight of the evidence demonstrates that Clayton was the instigator of the confrontation, and that he did not threaten her during the confrontation. In support of this argument, Gilliam cites the testimony of Hussain, the gas station employee. He also argues that he had "no real motive to threaten or intimidate anyone in this matter for a crime he did not commit."

{¶44}  In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011–Ohio–6254, 960 N.E.2d 955, ¶ 119.  "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins* at 387. But the weight and credibility of evidence are to be determined by the trier of fact. *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132. "A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it." *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014–Ohio–1941, ¶ 23. We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. *Id.*

{¶45}  The jury found Gilliam guilty of two counts of theft and a single count of intimidating a witness. Theft is defined as: "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or the person authorized to give consent". R.C.

2913.02(A)(1). In defining intimidation of a witness, R.C. 2921.04(B)(2) states: "[n]o person, knowingly and by force or by unlawful threat of harm to any person or property or by unlawful threat to commit any offense or calumny against any person, shall attempt to influence, intimidate, or hinder * * * [a] witness to a criminal or delinquent act by reason of the person being a witness to that act".

{¶46} Here, the State's evidence presented at trial, which included testimony from law enforcement officers, the victims, and associates of Gilliam, supported the jury's conclusion that Gilliam knowingly exerted control over the victims' property without their consent and with purpose to deprive them of their property. For instance, Clayton testified at trial that Gilliam had told her that he had stolen items in Orient, Ohio. Further, Clayton testified that Gilliam had asked for her help in selling the stolen purse and laptop belonging to the victims. Crissinger, Gilliam's ex-girlfriend, provided more details about Gilliam's involvement. Specifically, Crissinger testified that Gilliam had told her that he had taken purses, wallets, cell phones, a laptop, a television, and credit cards from the victims' home. Crissinger also claimed to have seen Gilliam destroy credit cards and dispose of a purse at a hotel in Grove City, Ohio. Moreover, both Crissinger and Schooley testified that Gilliam possessed and sold two cell phones on the same day that the victims reported the theft of two cell phones from their home. Finally, video and still shots from various stores was presented at trial that showed Gilliam using the debit card of one of the victims. The State also presented photographs of the stolen purse and wallet taken from Gilliam's cell phone shortly after the items were stolen.

{¶47} Gilliam testified at trial that he did not steal the items; instead, he only agreed to sell the items for Stone. However, the jury was free to believe all, part, or none of Gilliam's testimony. *West* at ¶ 23; *see also State v. Gavin*, 4th Dist. Scioto No. 13CA3592, 2015-Ohio-

2996, ¶ 29. Moreover, when conflicting evidence is presented at trial, a conviction is not against

the manifest weight of the evidence simply because the jury believed the testimony presented by

the State. *State v. Tyson,* 4th Dist. Ross No. 12CA3343, 2013–Ohio–3540, ¶ 21.

{¶48}   Likewise, while conflicting testimony was presented regarding the intimidation of

a witness charge, we reiterate that the jury was in the best position to judge and weigh the

credibility of the witnesses. Furthermore, Gilliam's argument that he had no motive to threaten

or intimidate Clayton because he was innocent of the burglary charge is misplaced. At the time

of the threats, Gilliam did not know that he would be acquitted of the burglary charge.

{¶49}   Based on the evidence before it, the jury neither clearly lost its way nor created a

manifest miscarriage of justice in finding Gilliam guilty of the two counts of theft and the

intimidation of a witness count. Accordingly, we overrule Gilliam's first assignment of error.

### D. Assistance of Counsel

{¶50}   Finally, in his third assignment of error, Gilliam alleges that he received

ineffective assistance of counsel. Specifically, Gilliam contends that he was prohibited from

introducing a defense exhibit containing his phone records from the morning of the burglary

because his trial counsel failed to disclose the existence of the exhibit to the State prior to trial.

Gilliam claims that the exhibit "might very well have led to a different outcome in this case"

because the phone records "might have provided insight into [his] whereabouts, mental state, and

other potential suspects in this case."

{¶51}   Criminal defendants have a right to counsel, including a right to the effective

assistance from counsel. *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d

763 (1970), fn. 14; *State v. Stout,* 4th Dist. Gallia No. 07CA5, 2008–Ohio–1366, ¶ 21. To

establish constitutionally ineffective assistance of counsel, a criminal defendant must show (1)

that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Goff,* 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95. "Failure to establish either element is fatal to the claim." *State v. Jones,* 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶ 14. In Ohio, there is a presumption that a properly licensed attorney is competent. *State v. Calhoun,* 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999).

{¶52}   Here, even if we were to assume that counsel's performance was deficient, Gilliam still cannot establish that his counsel's performance resulted in prejudice – i.e. the result of the proceedings would have been different. At trial, even though the trial court did not allow the phone records to be displayed or admitted as an exhibit, it did allow Gilliam's mother to testify about the phone records. Specifically, Gilliam's mother testified that she viewed her son's phone records from the day of the incident and that there was "activity from 2:08 A.M. to about 9:00 something or 8:00". She also testified that there were a number of calls that morning from a number associated with Stone. Thus, the evidence that was contained within the phone records was presented to the jury, albeit, in an alternative form. Moreover, we fail to see how this piece of evidence would have altered the outcome of Gilliam's trial even if presented in exhibit form. The fact that Gilliam was active on his cell phone near the time of the burglary does not prove, as Gilliam would like this Court to believe, that he could not have committed the offenses. If

anything, the evidence is inculpatory and proves that Gilliam was awake during the time the offenses were committed. In short, there is no indication that the results of the proceeding would have been different even if defense counsel had properly assured the admittance of the exhibit at trial.

{¶53}  For the forgoing reasons, we overrule Gilliam's third assignment of error.

## IV. Conclusion

{¶54}   Having overruled all of Gilliam's assignments of error, we affirm the judgments of the trial court.

JUDGMENTS AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENTS ARE AFFIRMED. Appellant shall pay the costs.

The Court finds that reasonable grounds existed for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J.: Concurs in Judgment and Opinion.
McFarland, J.: Concurs in Judgment Only.

For the Court

BY: _____
        Marie Hoover, Judge

### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**